UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

UNITED STATES OF AMERICA                                    PLAINTIFF

VS.                                    CRIMINAL NO.: 3:09CR92TSL-FKB

RICHARD NORTH                                              DEFENDANTS


MEMORANDUM OPINION AND ORDER

    This cause is before the court on the motion (and

supplemental motion) of defendant Richard North to suppress Title

III intercept and its fruit.  The Government has responded to the

motion and the court, having considered the memoranda of

authorities submitted by the parties, along with the evidence

adduced at the hearings on the motion, finds and concludes that

the motion should be denied.[1]

    During its criminal investigation of a drug trafficking

organization in the Jackson, Mississippi area, the Government

secured a series of court orders authorizing wiretaps on cell

_____

    [1]    Initially North moved to suppress the wiretap and fruits
of the wiretap of his own cell phone (identified as Target
Telephone 4).  On the eve of a scheduled hearing on the motion to
suppress, North filed a supplemental brief (which the court has
construed as a supplemental motion), arguing for suppression of
the wiretap on a cell phone used by codefendant Jerry Primer
(Target Telephone 3), as well as all conversations overheard on
that wiretap, and all evidence seized pursuant to information
gleaned from the intercept of the Primer phone, including evidence
(conversations) that led agents to North.  The Government has
moved to strike the supplemental brief, but the court concludes
that motion should be denied.

phones used by suspected participants.  The Government first obtained orders from Judge Henry T. Wingate, in the Southern District of Mississippi, authorizing wiretaps on two phones (Target Telephone 1 (TT1) and Target Telephone 2 (TT2)) used by one Kenny Lofton.  On March 16, 2009, based on intercepted conversations between Lofton and someone he called "Jack", agents conducted surveillance and observed Lofton meet with "Jack" in the parking lot of the Delta Mart on Medgar Evers Boulevard in Jackson.  Agents ran the license plate on the truck driven by "Jack" and determined that the truck was registered to a Jerry Primer at a Jackson, Mississippi address.  On March 18, 2009, the Government applied for and obtained a wiretap authorization from Judge Wingate for the cell phone known to be used by "Jack" (Target Telephone 3, or TT3).  The following day, agents obtained a copy of Primer's driver's license photograph and confirmed that "Jack" was indeed Jerry Primer.

Subsequently, on March 28, 2009, based on conversations intercepted over TT3 between Primer and someone he called "Billy," agents learned that "Billy" was traveling to Jackson, Mississippi to deliver cocaine to Primer.  Agents established surveillance and observed "Billy" arrive at Primer's house driving a blue Ford Explorer.  Agents ran a check on the license plate on the Explorer and determined the vehicle was a rental registered to Avis. Primer and "Billy" were then observed traveling to the Delta Mart

2

shopping center, where agents witnessed the delivery of cocaine to coconspirator Nicholas Coleman and others.[2]

Based on the intercepted calls and the surveillance of March 28, the Government applied for, and on April 28, obtained a court order from Judge Wingate authorizing a wiretap of the cell phone known to be used by "Billy," whose full identity, according to the Government, remained unknown as of the time of the application. The Government had obtained rental information from Avis which showed that the Explorer had been rented to a Richard North of Houston, Texas, but the Government claims it had not been able to determine whether the individual known as "Billy" whom they had observed delivering cocaine on March 28 was actually Richard North. North's identity, the Government claims, was only confirmed after the Government began intercepting calls over his phone (Target Telephone 4 (TT4)).

Based on conversations intercepted over TT4 prior to May 16, 2009, agents learned that Primer and North were making plans for a delivery of cocaine to Jackson for May 16. On that date, agents intercepted calls indicating that North was en route to Mississippi with several kilograms of cocaine. While traveling on Interstate 10, North was stopped by Texas troopers for speeding. His vehicle was searched by police officers and drug sniffing

---

[2]    Coleman was stopped after departing the shopping center, and agents seized cocaine and cocaine base from his vehicle.

dogs, but no drugs were found.  After approximately three hours, North was released.  Within minutes of being released, North called a female using TT4.  Well into the call, he revealed that he had hidden cocaine in the car in such a way that it would not be found by law enforcement.  He told the friend he was terminating his delivery to Mississippi and going back home by an alternate route.  Based upon that communication, police intercepted North at his home where he was arrested, allegedly in possession of three ounces of cocaine and two pistols.

North has moved to suppress the wiretap of Primer's cell phone, TT3, and all conversations overheard on the intercept, including those which led agents to learn of North's participation in the alleged conspiracy; and he has moved to suppress the wiretap of his own cell phone, TT4, all conversations overheard on that wiretap, and all evidence seized pursuant to information gleaned from these wiretaps, including but not limited to the cocaine and weapons allegedly seized at the time of his arrest, and any other evidence the seizure of which was in some way traceable back to the intercepted subject matter.  North argues that the court should order suppression with respect to both wiretaps: (1) on jurisdictional grounds; (2) because the facts set forth in the wiretap applications, and supporting affidavits made by DEA Special Agent Christopher Gale do not establish the necessity required to justify the issuance of the wiretap orders;

and (3) because, with reference to the May 16 conversation intercepted on the North wiretap, minimization protocols were not followed in any meaningful way.  The court addresses these arguments in turn.

JURISDICTION:

The use of wiretaps and evidence obtained therefrom is governed by Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (Title III).  18 U.S.C. §§ 2510 *et seq*.  To obtain a wiretap authorization order, a law enforcement agent must file an application with a "judge of competent jurisdiction," id. § 2518(1), which is defined to include "(a) a judge of a United States district court or a United States court of appeals," id. § 2510(9).  Section 2518(3) authorizes a district judge to approve a tap "within the territorial jurisdiction of the court in which the judge is sitting (and outside that jurisdiction but within the United States in the case of a mobile interception device authorized by a Federal court within such jurisdiction)." "Interception" is defined as "aural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device."  Id. § 2510(4).  The Fifth Circuit held in United States v. Denman that "[b]ecause the definition of interception encompasses the aural acquisition of the contents of the communication," the location of the interception includes "the situs of the telephone itself" and

5

also includes "the place where the contents of a wire communication are first to be heard and understood by human ears, other than those of the parties to the conversation[,]" i.e., the original listening post.  100 F.3d 399, 403 (5th Cir. 1996), cert. denied, 520 U.S. 1121, 117 S. Ct. 1256, 137 L. Ed. 2d 336 (1997)(citing and quoting United States v. Rodriguez, 968 F.2d 130, 136 (2d Cir. 1992)).  Although Denman involved a land-line phone, courts have applied the same definition of interception to hold that cell phone communications "are deemed intercepted at two places: where the tapped telephone is located and where the communications are overheard." United States v. Goodwin, 131 F.3d 132 (2d Cir. 1997) (unpub.) (citing Rodriguez, 968 F.2d at 136, and Denman, 100 F.3d at 402-04).

The Primer Phone:  It is undisputed that the Primer cell phone was actually located in Mississippi at all relevant times. Thus, interception of TT3 clearly occurred in the Southern District of Mississippi.  Notwithstanding this, North seeks exclusion of all conversations intercepted on TT3, and any fruits of those conversations, on the basis that application for the wiretap and resulting order authorizing the wiretap did not comply with § 2518(1)(b)(ii) and (4)(b), which provide, respectively, that the wiretap application and authorization order must describe/specify the nature and location of the communications facilities from which, or the place where the communication is to

6

be intercepted.  North contends that because there was no
indication in the wiretap application or order authorizing the
wiretap of TT3 that either the phone or the monitoring post was
located within the court's territorial jurisdiction, then it
follows that the intercept order is "facially lacking in
jurisdictional nexus."[3]  However, courts have recognized that
since a cell phone has no fixed location, then to satisfy the
requirements of §§ 2518(1)(b)(ii) and 2518(4)(b), it is sufficient
to identify the cellular phone (i.e., "communications facility")[4]
to be tapped by its telephone number and electronic serial number
(ESN).  See Goodwin, 141 F.3d at 402-403 (holding that when a
cellular phone is involved, identification by number and ESN is
sufficient).  As it is undisputed that the intercept order
identified TT3 in this manner, North's objection is without
merit.[5]

---

[3]    See 18 U.S.C. § 2518(10)(a) ("Any aggrieved person in
any trial, hearing, or proceeding in or before any court ... may
move to suppress the contents of any wire or oral communication
intercepted pursuant to this chapter, or evidence derived
therefrom, on the grounds that ... (ii) the order of authorization
or approval under which it was intercepted is insufficient on its
face....")

[4]    A cellular phone number is a "communications facility."
United States v. Hermanek, 289 F.3d 1076, 1086 n.3 (9th Cir. 2002)
(citations omitted).

[5]    A few other points are made with respect to North's
challenge in this regard.  First, while Title III does require
that the wiretap application be made to a judge of "competent
jurisdiction" and provides such judge may authorize the
interception of electronic communications within his territorial

The North Wiretap:

North contends for suppression of the wiretap of TT4, his own cell phone, on jurisdictional grounds, arguing that Judge Wingate lacked jurisdiction to order interception of TT4 since neither the phone nor the listening post for the wiretap was located within the court's territorial jurisdiction.[6]  See Goodwin, 131 F.3d at 132 (cell phone communications deemed intercepted "at two places: where the tapped telephone is located and where the communications are overheard").  In response, the Government argues that while the Fifth Circuit held in Denman that interception occurs both at the place where the tapped phone and the original listening post are located, it did not purport to hold, and in fact has never

jurisdiction, North has pointed to no requirement in Title III that the application or the wiretap order include a recitation of the jurisdictional basis for the application or order, e.g., by identifying the district in which monitoring is to occur or in which the phone is physically located.  Thus, such an omission could not render the application or order facially insufficient.  Moreover, the application for TT3 actually does identify a basis for territorial jurisdiction.  The agent's affidavit for the application identifies "Jack" (now known as Primer), the user of TT3, as the primary supplier of drugs to Kenny Lofton (user of TT1) in the Jackson, Mississippi area; recites that "Jack" has a club on Medgar Evers Boulevard in Jackson; and otherwise makes clear that "Jack" is operating (and hence using TT3) in Jackson, Mississippi.  In any event, as the court concludes infra, the absence of territorial jurisdiction is not a basis for suppression in any event.  See infra at pp. 10-16.

[6]    The court does not understand North to contend that intercepted conversations between him and Primer, who was in Mississippi, are subject to being suppressed.  His motion as it relates to TT4 instead focuses solely on the May 16 conversation, which began and ended in Texas.

8

held that these are the *only* places in which jurisdiction can lie.
The Government submits that as a matter of first impression, this
court would be warranted in finding jurisdiction was proper in the
Southern District of Mississippi for a number of reasons,
including that the interception was to be made of a mobile phone,
not a land-line phone as in <u>Denman</u>; the mobile phone was being
used to facilitate the distribution of narcotics into the Southern
District of Mississippi; that on one occasion during this
facilitation, TT4 was known to have been located and used by
"Billy" in the Southern District of Mississippi; although the
monitoring post was located in Louisiana, a simultaneous feed and
aural acquisition station was located in the wire room of the
DEA's Jackson, Mississippi office in the Southern District of
Mississippi, so that aural acquisition was occurring in both
jurisdictions simultaneously; and the investigation began in the
Southern District of Mississippi with the same district court
judge reviewing and passing on the propriety of each of the four
Title III applications.  The Government contends that each of
these reasons alone is sufficient to support jurisdiction within
the Southern District of Mississippi, so that upon considering
these reasons cumulatively, it necessarily follows that
jurisdiction was proper.

The problem with the Government's position is that, for most
of the reasons cited by the Government, the statute, by its terms,

does not authorize jurisdiction.  By its terms, the statute only
grants a judge jurisdiction to authorize or approve "*interception*
of wire, oral, or electronic communications *within the territorial
jurisdiction of the court* in which the judge is sitting (and
outside that jurisdiction but within the United States in the case
of a mobile interception device authorized by a Federal court
within such jurisdiction)."  (Emphasis added).  Territorial
jurisdiction is tied to the place of interception.  The statute
does not grant a court jurisdiction to authorize interception on
the basis that the wiretap is sought as part of an investigation
of criminal activity within the district; or on the basis that the
judge in that district has issued wiretaps of coconspirators'
phones; or on the basis that the phone sought to be tapped is
being used to facilitate the distribution of drugs into the
district.  The Government has offered no authority to suggest
otherwise.

The court does agree with the Government that the statute
would authorize territorial jurisdiction in Mississippi if aural
acquisition had occurred simultaneously in Louisiana (where the
Government established the monitoring post) and at the DEA office
in Jackson.  But while agents in the Jackson office apparently had
the *capability* to hear conversations at the same time as the
agents manning the Louisiana monitoring post, this did not occur.

10

The Government's best argument for territorial jurisdiction relates to the mobility of cell phones, a feature which distinguishes them from land-line phones (a land-line phone having been involved in Denman).  The Government notes that in United States v. Ramirez, the Sixth Circuit, precisely because of the mobile nature of cell phones, held that a Wisconsin District Court had jurisdiction to authorize a wiretap on a cell phone that was being used in Minnesota to conduct business of a conspiracy with ties to Wisconsin even though the listening post was also in Minnesota.  112 F.3d 49, 852 (6th Cir. 1997).  The Government submits that because this case involves a wiretap of a cell phone, then here, just as in Ramirez, Judge Wingate had jurisdiction to order the wiretap of North's phone even though neither his cell phone nor the listening post was located within the court's territorial jurisdiction.

The court need not resolve this issue, however, because in the court's opinion, the absence of territorial jurisdiction is not a basis for suppression.[7]  Title III prohibits the use of

---

[7]    As this court reads Ramirez, in effect, the court held that a cell phone is a "mobile interception device" within the contemplation of § 2518(3), so that a judge in any district is authorized to approve a tap of a cell phone located outside the court's jurisdiction but within the United States.  See United States v. Ramirez, 112 F.3d 849, 853 (7th Cir. 1997) (stating, "The term (mobile interception device) in context means a device for intercepting mobile communications, and so understood it authorized the district judge in the Western District of Wisconsin to order a tap on the (cell) phone thought to be used by Hotchkiss, regardless of where the phone or the listening post

wiretap evidence in any trial "if the disclosure of that

information would be in violation of this chapter."  18 U.S.C.

§ 2515.  Pursuant to § 2518(10)(a), an "aggrieved person" may move

to suppress

> the contents of any wire or oral communication
> intercepted ... or evidence derived therefrom, on the
> grounds that (i) the communication was unlawfully
> intercepted; (ii) the order of authorization or approval
> under which it was intercepted is insufficient on its
> face; or (iii) the interception was not made in
> conformity with the order of authorization or approval.

While both constitutional and statutory violations may implicate

suppression under § 2518(10)(a), United States v. Ruiz, No. 09 Cr.

719(DAB), 2010 WL 4840055, 4 (S.D.N.Y. Nov. 19, 2010) (citing

United States v. Giordano, 416 U.S. 505, 527-28, 94 S. Ct. 1820,

40 L. Ed. 2d 341 (1974)), the Supreme Court has held that

"suppression is not mandated for every violation of Title III,"

United States v. Chavez, 416 U.S. 562, 575, 94 S. Ct. 1849, 40 L.

---

was.").  A cell phone is not certain to be located in a particular
district at or during any particular time any more than a person
can be certain to be located within a particular district at a
particular time.  Thus, as the court observed in Ramirez, under a
literal reading of § 2518(3), "the government, to be sure of being
able to tap the phone if it is carried outside the district (as is
it is quite likely to be, given its mobility), must obtain the
wiretap order from the district court in which the listening post
is located, even though that location is entirely fortuitous from
the standpoint of the criminal investigation." Id. (further
observing that "the government can always seek an order from the
district court for the district in which the listening post is
located authorizing nationwide surveillance of cellular phone
calls").  The court is nevertheless dubious that Congress intended
"mobile interception device" to include cellular telephones.

Ed. 2d 380 (1974) (holding that not "every failure to comply fully
with any requirement provided in Title III would render the
interception of wire or oral communications 'unlawful,'" and that
misidentification of the official authorizing a wiretap
application did not require suppression of wiretap evidence under
§ 2518(10)(a)(i) when the application was authorized by an
appropriate official).

        "Congress intended to require suppression where there is
failure to satisfy any of those statutory requirements that
directly and substantially implement the congressional intention
to limit the use of intercept procedures to those situations
clearly calling for employment of this extraordinary investigative
device." Giordano, 416 U.S. at 527, 94 S. Ct. at 1832. "Wiretap
evidence must be suppressed when provisions that are 'intended to
play a central role in the statutory scheme' are violated." Ruiz,
2010 WL 4840055, at 4 (quoting Giordano, 416 U.S. at 528, 94 S.
Ct. At 1833). See Giordano, 416 U.S. at 528, 94 S. Ct. at 1832-33
(holding suppression required based on government's failure to
obtain authorization for wiretap application from a statutorily
designated official since "the provision for pre-application
approval was intended to play a central role in the statutory
scheme and that suppression must follow when it is shown that this
statutory requirement has been ignored"). However, "[a] technical
defect ... is insufficient grounds to warrant suppression."

13

United States v. Garcia, No. 04 CR. 603(HB), 2005 WL 589627, at 5 (S.D.N.Y. March 14, 2005) (citing United States v. Radcliff, 331 F.3d 1153 (10th Cir. 2003)).  See also United States v. Donovan, 429 U.S. 413, 438, 97 S. Ct. 658, 673, 50 L. Ed. 2d 652 (1977) (holding that suppression was not required where application did not identify "the person, if known, committing the offense and whose communications are to be intercepted" and did not inform the judge of the identities of persons whose conversations were intercepted, and stating, "In no meaningful sense can it be said that the presence of that information as to additional targets would have precluded judicial authorization of the intercept.").

"The thrust of Giordano and Chavez is that only the violation of a sufficiently important statutory provision will render an interception 'unlawful' under § 2518(10)(a)(i)."  United States v. Simels, No. 08-CR-640 (JG), 2009 WL 1924746, at *10 (E.D.N.Y. July 2, 2009) (cited in Ruiz, supra).  See also United States v. Caggiano, 667 F.2d 1176, 1179 (5th Cir. 1981) (stating that technical noncompliance with requirements of wiretap statute "necessitates suppression ... only if the violated procedure is a central or a functional safeguard in the statutory scheme to prevent abuses of the wiretap act and if the purpose of the procedure has been frustrated or the procedure has been deliberately ignored").

14

While "[t]he requirement of judicial approval is obviously at the core of the congressional purposes underlying [the] statute," <u>United States v. Moore</u>, 41 F.3d 370, 375 (8th Cir. 1994), in the court's opinion, *territorial* jurisdiction is not central to the purposes of Title III.  A number of courts have so indicated.  <u>See</u>, <u>e.g.</u>, <u>Adams v. Lankford</u>, 788 F.2d 1493, 1497 (11th Cir. 1986) (holding in habeas context that the fact that wiretap orders were issued by a judge from outside the county in which some of the telephones were located was merely a "technical violation" and did not "implicate[] the core concerns of [Title III]"); <u>United States v. Rodriguez</u>, 734 F. Supp. 116, 120 (S.D.N.Y. 1990) (observing that the defendant's argument that judge lacked jurisdiction to authorize wiretapping of telephones located outside of his territorial jurisdiction may "overstate the implications of the issue involved" since "[a]lleged violations of the territorial jurisdiction's limitations were not such a 'core' concern of Congress in enacting Title III as to be cognizable on a habeas corpus petition; such violations are 'merely formal or technical errors'") (citing <u>Adams</u>, 788 F.2d at 1497–1500), <u>aff'd</u>, <u>Rodriguez</u>, 968 F.2d 130 (2d Cir. 1992)); <u>cf</u>. <u>Rodriguez</u>, 968 F.2d at 145 (Meskill, J., concurring) (opining, contrary to majority, that district judge lacked territorial jurisdiction to issue intercept order, but also opining that lower court did not err in admitting wiretap evidence since "the government, having obtained the

communications pursuant to court authorization, neither knew nor had reason to know that the information had been obtained in violation of Title III").

The statute authorizes territorial jurisdiction where interception occurs.  See Denman, supra.  Interception occurs where the phone is located and where the listening post is located.  Id.; see also Goodwin, supra.  And while as a practical matter, the location of the tapped phone will usually bear some relation to the criminal activity under investigation, that is not necessarily true of the listening post.  As the court observed in Ramirez, the listening post may for practical reasons be located outside the district in which the crime is being investigated and the cell phone is believed to be located, and yet notwithstanding that "the location is entirely fortuitous from the standpoint of the criminal investigation," Ramirez, 112 F.3d at 853, a district judge in the district where the listening post is located would undeniably have territorial jurisdiction to issue a wiretap authorization.[8]  Given this, it can hardly be said that territorial jurisdiction is intended to play a central role in the statutory scheme.  The fact is, a judge of "competent

---

[8]     Indeed, it is the court's understanding that the Government may establish a listening post for a wiretap in any district it chooses, giving no regard whatsoever to whether the district has any relation to the individuals or criminal activity under investigation.

jurisdiction" reviewed the applications and issued the challenged intercept orders, and thus, "the essential requirement of § 2518 that 'law enforcement authorities ... convince a District Court that probable cause existed to believe that a specific person was committing a specific offense using a specific telephone,'" was met. United States v. Duran, 189 F.3d 1071, 1086 (9th Cir. 1999) (holding that failure of intercept order to identify the proper ESN for the intercepted phone "did not result in a failure to ensure that the surveillance would only occur in situations 'clearly calling' for its use") (quoting Donovan, 429 U.S. at 437 n.25, 97 S. Ct. 658). Therefore, suppression is not required on jurisdictional grounds, regardless of whether the listening post or tapped cell phone was located within the court's territorial jurisdiction.

Necessity:

In addition to his jurisdictional challenge, North has moved to suppress evidence produced by or derived from the wiretaps of both his and Primer's cell phones, on the basis that the applications, and supporting affidavits, for court authorization did not satisfy the showing of necessity required by 18 U.S.C. § 2518(1)(c). He argues that the applications for both wiretaps failed the necessity requirement because Agent Gale's affidavits in support of the applications contained material misrepresentations and omissions, without which there was an

17

insufficient showing of necessity for the wiretaps.  He also claims, more generally, that even if there were no misrepresentations or omissions, necessity was still lacking as the applications failed to present any actual facts-as contrasted with boilerplate allegations that would be true in any alleged drug-trafficking conspiracy-suggesting why alternative investigative techniques had not been tried and/or would not likely have succeeded.

Section 2518(1)(c) requires that each affidavit in support of an application for a wiretap contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  This "necessity" requirement was included in the statute in order to prevent wiretapping from being utilized in cases where "traditional investigative techniques" are sufficient.  See United States v. Collins, 927 F.2d 1385, 1412 (5th Cir. 1992) (citing United States v. Webster, 734 F.2d 1048 (5th Cir. 1984)).  As the Supreme Court explained in Giordano, Congress intended to "make doubly sure that the statutory authority for wiretaps be used with restraint and only where the circumstances warrant surreptitious interception of wire and oral communications" and thus included a necessity requirement as a means to protect against the use of a wiretap as

18

the "initial step in a criminal investigation."  416 U.S. at 515, 94 S. Ct. at 1826-27.

     To satisfy the necessity requirement, the Government is not required to show to a certainty that normal investigative techniques will not succeed, or that "every other imaginable mode of investigation would be unsuccessful."  See United States v. Diadone, 558 F.2d 775, 778 (5th Cir. 1977).  Instead, it need only show that such techniques reasonably appear to be unlikely to succeed if tried; so what is required of the court is a "common sense" evaluation of the statements in the affidavit to determine if necessity has been established.  See United States v. Guerra-Marez, 928 F.2d 665, 670 (5th Cir. 1991).  In doing so, the court should take into account affirmations based on the specialized training and experience of law enforcement officers, U.S. v. Heilman, 377 Fed. Appx. 157, 186, 2010 WL 1583097, 19 (3d Cir. 2010) (citation ommitted), but bearing in mind that "applications which use 'general declarations and conclusory statements' or '"boiler plate" [statements] and the absence of particulars' do not meet the full and complete statement requirement."  Id. (citations omitted).  See also United States v. Landmesser, 553 F.2d 17, 20 (6th Cir.) ("While the prior experience of investigative officers is ... relevant in determining whether other investigative procedures are unlikely to succeed if tried, a purely conclusory affidavit unrelated to the

19

instant case and not showing any factual relations to the circumstances at hand would be ... inadequate compliance with the statute."), <u>cert</u>. <u>denied</u>, 434 U.S. 855, 98 S. Ct. 174, 54 L. Ed. 2d 126 (1977).

In this case, North argues that the wiretap evidence should be suppressed on <u>Franks v. Delaware</u>, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), grounds because Agent Gale's affidavits used to obtain court authorization for the wiretaps contained material misrepresentations and omissions that bore directly on necessity for the wiretap. As the Fifth Circuit has explained, "[s]pecial problems are presented when the affidavit in support of the wiretap application allegedly contains intentional or reckless misrepresentations or falsehoods." <u>Guerra-Marez</u>, 928 F.2d at 670. In <u>Franks</u>, the Court said: "[W]hen the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a truthful showing." 438 U.S. at 171-72, 98 S. Ct. at 2681. The <u>Franks</u> Court thus concluded that in evaluating probable cause, courts were not limited to the face of the warrant, but could look beneath the face of a warrant and inquire into the truthfulness of any supporting affidavits. <u>Daniel v. Ferguson</u>, 839 F.2d 1124, 1129 (5th Cir. 1988) (citing <u>Franks</u>, 438 U.S. at 171-72, 98 S. Ct. at 2684-85). <u>See</u> <u>also</u> <u>United States v. Brown</u>, 298 F.3d 392, 407 (5th Cir. 2002) (observing that "'[o]missions or misrepresentations can

20

constitute improper government behavior.' 'By reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw.  To allow a magistrate to be misled in such a manner could denude the probable cause requirement of all real meaning.'") (citations omitted).  The <u>Franks</u> holding applies to the showing of necessity and probable cause in wiretap applications.  <u>See</u> <u>Guerra-Marez</u>, 928 F.2d at 670.

To obtain suppression on <u>Franks</u> grounds, North has the burden to prove that alleged misrepresentations or omissions were knowingly or recklessly made by Agent Gale, and that the result of excluding the alleged misrepresentations and including the alleged omissions would have been a lack of necessity for issuance of the wiretap order.  <u>See</u> <u>Brown</u>, 298 F.3d at 407 (defendant making a claim of intentional material omission must preliminarily show that "the affiant intentionally or recklessly omitted facts required to prevent technically true statements in the affidavit from being misleading" and even if this is shown, he is not entitled to relief "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause").  In the court's opinion, North has failed to carry that burden.[9]

---

[9]     To be entitled to a <u>Franks</u> hearing, a defendant must make a substantial showing to this effect, supported by proof.

The Primer Wiretap: North notes that in the affidavit in support of the wiretap application for the Primer cell phone, Agent Gale represented that the identity of "Jack" was not known and that the wiretap was needed to determine "Jack's" identity.[10] North contends that contrary to Agent Gale's assertion, agents had already identified "Jack" as Jerry Primer prior to the Government's submitting the wiretap application to Judge Wingate by virtue of having obtained the vehicle registration information showing the truck driven by "Jack" was registered to Primer and having used that information to conclusively identify "Jack" as Primer by no later than March 17, the day before the application was submitted to Judge Wingate.  This, he submits, is evidenced by Agent Gale's DEA 6 report, purportedly prepared on March 17, which

_____

Here, the court held a hearing on the motion to suppress, which was originally aimed as ascertaining the parties' positions and the facts pertinent to North's jurisdiction arguments.  At the hearing on the motion to suppress, North was permitted to offer evidence, and to cross-examine Agent Gale; and thus, while he may not have been entitled to a Franks hearing, the purpose such hearing is intended to serve was met.

[10]   For example, the affidavit recited:
Since, Jack has not been fully identified, arresting Jack is impossible at this time...
...
Further, by way of example, surveillance would be unlikely to identify JACK or his sources of supply...
...
Trash searches have not been conducted of the residence of Jack due to the fact that the location of Jack's residence is unknown.  In the event Jack's residence is identified, an investigation decision will be made to attempt a trash pull if so warranted.

recites that "Jack" had been identified as Jerry Primer of
Jackson.  North argues, alternatively, that even if agents had not
actually identified Primer by the date of the application, they
admittedly had observed him and knew what he looked like and were
in possession of vehicle registration information, and thus had
the capability to confirm "Jack's" identity as Primer by
traditional investigative techniques, such as obtaining a copy of
his driver's license photo; yet rather than pursue such obvious
methods, Agent Gale both misrepresented in his affidavit that
agents did not know "Jack's" identity and omitted from his
affidavit the fact that agents had already determined that the
truck driven by "Jack" was registered to Jerry Primer.  He submits
that the affidavit was thus clearly materially misleading as to
the necessity for the wiretap.

    In response to North's assertions, the Government explains
that while agents had determined on March 16 that the truck driven
by "Jack" was registered to Jerry Primer of Jackson, that did not
necessarily mean that the individual driving the truck was Jerry
Primer.  And, since agents did not have immediate access to a
photograph of Jerry Primer, they did not know right away whether
the driver was, in fact, Primer.  Moreover, while a DEA
intelligence analyst had requested a copy of Primer's driver's
license photograph, that copy was not received by agents until
March 19, after the wiretap application had been submitted and the

23

intercept order issued.  As for the DEA 6 bearing the date of
March 17 which reported that "Jack" had been identified as Jerry
Primer, Agent Gale explained in his testimony that March 17 was
the date on which he had begun preparing that report; he did not
finalize and submit the report to his supervisor until March 23,
and the information regarding Primer's identity, he stated, was
not included in the report until *after* Primer's driver's license
had been obtained on March 19, i.e., *after* the intercept order had
been issued.

     In the court's opinion, North has not shown that Agent Gale
or the other agents knew that "Jack" was Jerry Primer at the time
the wiretap application was submitted to Judge Wingate.  Further,
the court is not persuaded that the omission of information
regarding the vehicle registration reflects intentional misconduct
or a reckless disregard for the truth.  Agent Gale credibly
explained that the fact that the truck driven by "Jack" was
registered to Primer was not material, since more often that not,
vehicles in this state are not driven by the persons to whom they
are registered.  He further testified that he saw no reason to
await receipt of the driver's license to seek the wiretap
authorization, since identifying "Jack" was only one of the
reasons for seeking wiretap authorization.  The wiretap was also
necessary to learn of the scope of the organization, Primer's
coconspirators, his sources of supply, his importation method, the

routes, and the properties involved; and other investigative techniques were inadequate to ascertain this information.

For his part, North acknowledges Gale's affidavit recites additional bases for seeking the wiretap; but he maintains that the only *specific* factual assertions concerned the alleged need to identify "Jack" and the remaining were merely conclusory, boilerplate assertions that would be true of any drug-trafficking investigation. And he argues that the application made no effort to explain why agents had not or could not achieve their asserted goals through the use of other investigative techniques, such as surveillance, trash searches, interviews, search warrants, grand jurys, pen registers, arresting Primer, consensual recordings, informants, or undercover officers.

North is correct that "'[m]ere conclusory statements based upon an affiant's investigatory experience that drug conspiracies are "tough to crack" will not, without more, form a basis for obtaining a wiretap.'" United States v. Charles, No. Crim. 97-10107-PBS, 1998 WL 204696, 18 (D. Mass. Jan. 13, 1998) (quoting United States v. Scibelli, 549 F.2d 222, 227 (1st Cir. 1977), cert. denied, 431 U.S. 960, 97 S. Ct. 2687, 53 L. Ed. 2d 278 (1977)). However, "[c]ourts may 'consider the nature of the alleged crimes' in determining the likelihood of success of conventional investigatory techniques." Id. (quoting Scibelli). Moreover, courts have recognized that "'[b]ecause drug trafficking

25

is inherently difficult to detect and presents formidable problems in pinning down the participants and defining their roles, investigative personnel must be accorded some latitude in choosing their approaches.'" Id. (quoting United States v. David, 940 F.2d 722, 728 (1st Cir. 1991), cert. denied, 502 U.S. 989, 112 S. Ct. 605, 116 L. Ed. 2d 628 (1991), and citing United States v. Uribe, 890 F.2d at 556 ("By its very nature, interstate drug trafficking is hard to pin down.")).

Here, the court concludes that the Government sufficiently explained in the application why other investigative methods would not have worked to achieve the goals of the investigation.  The affidavit and application explained that as the investigation rises through the sources of supply in a drug-trafficking organization, the use of undercover agents to infiltrate and make controlled buys diminishes.  The same is true for the use of confidential sources and sources of information.  Agent Gale stated that these kinds of efforts were made at the lower levels of the organization, but asserted that such efforts were not reasonably possible beyond that.  He explained in detail that while surveillance was conducted on Lofton's activities as well as those of "Jack", surveillance did not and could not disclose the full activities of "Jack", including his source(s) of supply, the identity of other participants, and information about specific transactions.  And he likewise explained why other normal

26

investigative methods were of limited or no utility.  In sum, the court concludes that, considered in the context of this particular investigation, Agent Gale's affidavit in support of the wiretap application of the Primer phone presented adequate detail regarding the investigation and various investigative techniques that had been attempted, and the reason for their failure, as well as those that were not possible in light of the investigative goals.

The North Wiretap:  With respect to the wiretap of his own phone, North argues (much as he did in the case of the Primer wiretap) that while agents were well aware of his identity at the time the wiretap application was submitted to Judge Wingate, the wiretap application for his phone falsely represented that his identity was unknown to agents and that all the typical less intrusive investigative methods therefore would have no hope of success.[11]  He claims that the "the only factor that arguably

_____

[11]    For example, the affidavit recited:
In addition, PRIMER is known to utilize FNU LNU aka BILLY as a source for cocaine.  At this time, FNU LNU aka BILLY'S full identity has not been revealed.
...
Furthermore, the full identity of FNU LNU aka BILLY has yet to be determined and therefore we do not have any confidential source of information that would be able to assist in the dismantling of this group.
...
Since FNU LNU aka BILLY has not been fully identified, arresting him or PRIMER is impossible at this time...
...
Further, by way of example, surveillance would be

militates toward a finding that a necessity existed for tapping his phone was the idea that his identity was unknown to agents," and that once the offending statements are stricken from the agent's affidavit, it is apparent from the reconstructed application that there was no necessity for the wiretap.

The evidence of record shows that on March 28, the date North was observed making a delivery of cocaine to Primer in Jackson, agents ran a check on the license plate on the Ford Explorer which "Billy" was driving and determined the car was an Avis rental car. Records were subpoenaed from Avis, which on April 6, reported that the Explorer was rented to Richard North, of 2911 Vegas Street, Houston, Texas. This information was not included in the application for interception for North's phone. North argues that in failing to disclose in the application that agents had learned from Avis that Richard North was the person who had rented the car seen at Primer's home delivering cocaine on March 28, the government intentionally omitted material information. It went even further, he submits, by affirmatively misrepresenting to Judge Wingate that "Billy's" identity was unknown, when in fact, it knew from Avis's records that "Billy" was Richard North.

--------

unlikely to identify FNU LNU aka BILLY or his sources of supply for illegal narcotics and other high level conspirators.

The court is satisfied that Agent Gale did not know the identity of Richard North at the time he submitted his affidavit in support of the wiretap application, and is further satisfied that Agent Gale did not believe that Richard North was the user of TT4.  Agent Gale knew only that TT4 was issued in the name of "Boost User," and that the vehicle driven by the user of TT4 in Jackson, Mississippi, on March 28, 2009, had been rented by a Richard North.  Upon receiving the rental information from Avis, agents requested a driver's license photograph of Richard North from Texas, which they received on April 9; but since no one had gotten close enough on March 28 to see the driver's face and the video that had been taken did not clearly show his face, there was nothing to which they could compare the driver's license photo for identification purposes.  Agent Gale also explained that an individual involved in drug trafficking typically would not have rented a vehicle in which to transport drugs in his own name, but rather would have had someone else – a nominee – rent the vehicle. He credibly maintained that this is precisely what agents thought had occurred in this case.  Especially since the phone was in a bogus name with a bogus address, agents believed that Richard North was just the person-"a nobody"--who rented the car, and that Richard North was not the user of the phone or the source that

29

agents knew as "Billy."[12]  North has not proven otherwise, and the court thus concludes that the wiretap application did not contain any intentional or reckless misrepresentations or falsehoods.

Agent Gale further testified that even if he had known that "Billy" was Richard North, that would not have obviated the need for the wiretap since the fact that "Billy" had not been identified was only one of the reasons for the application.  Agent Gail also contended in his affidavit for the intercept order that the intercept of TT4 would allow agents to "obtain a clear understanding of the drug trafficking activities of FNU LNU a/k/a BILLY and others, as well as to have the best opportunity to identify all of the importation, transportation, and distribution routes and the persons that are participating in and facilitating the criminal activities of the distribution groups."  In addition, a more specific need arose on April 7, 2009, when agents overheard a conversation via the tap on TT3 in which Primer indicated to "Billy" that he had gotten a new phone and was "trying to let the minutes run out" on TT3; in fact, no other calls were intercepted on TT3 after April 7.  Agent Gale reported in his affidavit that

---

[12]    Gale testified that once they began intercepting calls on TT4, agents were "shocked to discover" that the guy who rented the car was actually the source.  He testified,

> Why would the drug dealer rent the car in his own name?
> That really threw us a curve ball, and that's why it's
> like that in the affidavit.  We weren't focused in on
> Richard North in the affidavit because we didn't think
> it was worthy.

prior to this conversation, Primer and "Billy" had been discussing a delivery of cocaine to Mississippi which they intended to accomplish in the near future; that agents had been unable to identify any other phone used by Primer; and that it was thus "critical that agents be authorized to intercept TT4 as there [was] no other means by which agents [would] be able to respond to this event."[13]   Clearly, ascertaining the full identity of "Billy" was only one of the reasons for securing the wiretap.   And, in the court's opinion, in the case of the North wiretap, as with the Primer wiretap, the Government's application, including the accompanying affidavit, presented sufficient detail regarding the goals of the investigation, the various investigative techniques that had been attempted, and the reason for their failure, as well as those that were not possible in light of the investigative goals.

Minimization

North finally argues that the conversation between him and a female friend which agents intercepted on May 16, 2009, and any fruits of that conversation, must be suppressed since agents

---

[13]   Gale stated in his affidavit,
At this time, agents have been unable to identify any other phones known to be used by PRIMER.   The interception of TARGET TELEPHONE 4 will allow agents to overhear PRIMER as he directs FNU LNU a/k/a BILLY in Jackson, Mississippi during the aforementioned drug delivery.

failed to follow minimization protocols with respect to that
conversation.  Federal law "requir[es] electronic surveillance to
'be conducted in such a way as to minimize the interception of
communications not otherwise subject to interception.'"  United
States v. Brown, 303 F.3d 582, 604 (5th Cir. 2002) (quoting United
States v. Bankston, 182 F.3d 296, 307 (5th Cir. 1999) (quoting 18
U.S.C. § 2518(5)), rev'd on other grounds, 531 U.S. 12, 121 S. Ct.
365, 148 L. Ed. 2d 221 (2000)).  "The government's efforts to
minimize interception of non-pertinent conversations 'must be
"objectively reasonable" in light of the circumstances confronting
the interceptor.'"  Id. (quoting Bankston); see also Scott v.
United States, 436 U.S. 128, 130 98 S. Ct. 1717, 56 L. Ed. 2d 168
(1978) (stating, "The statute does not forbid the interception of
non-relevant conversations, but rather instructs the agents to
conduct the surveillance in such a manner as to minimize the
interception of such conversations.").  The Fifth Circuit has set
forth a three-part test to determine whether the government's
minimization efforts meet this standard: "'(1) the nature and
scope of the criminal enterprise under investigation; (2) the
Government's reasonable inferences of the character of a
conversation from the parties to it; and (3) the extent of
judicial supervision.'"  Brown, 303 F.3d at 604 (quoting
Bankston).

North points out that the minimization instructions provided to the agents authorized spot monitoring for not more than two minutes, and authorized continued monitoring when the conversation relates to the alleged crimes under investigation.  He notes that the subject phone conversation lasted a little over an hour, during the first fifty minutes of which he was describing a recent concert and he and his friend were discussing the stop, with North acting as if he had been wrongly detained and was a victim of racially-motivated police profiling.  Then, six minutes later, North admitted that he was in fact in possession of contraband that the police had failed to detect.  North submits that notwithstanding the fact that the conversation ultimately became incriminatory, the agents' continued and essentially uninterrupted monitoring was not reasonable when what they first heard was uninterrupted and seemingly innocent conversation that came on the heels of a lengthy search that revealed no evidence of wrongdoing.

The Government notes that the subject call lasted one hour nine minutes and fifty-two seconds, during which it was minimized eight times for a total of six minutes and seventeen seconds.  It states that during the call, North complained about racial profiling and about the way he was treated by the police.  He also described the questions posed by the police while he was stopped.  And, while North's conversation turned to other matters many times during the conversation, he kept returning back to the stop.  It

states that given the context, the actions of the agents in minimizing the phone call eight times is reasonable.  It notes the conversation included the target as a participant; that it occurred immediately after the stop and search for drugs which agents knew from other tapped conversations were concealed in the vehicle; and that North continued throughout the conversation to talk about the stop and search, including the reasons for the stop, and the stop itself.  The court agrees with the Government that under the circumstances, it was reasonable for agents to continue monitoring the call.

<u>Conclusion</u>

Based on all of the foregoing, it is ordered that defendant's motion to suppress is denied.

SO ORDERED this 14th day of February, 2010.


<u>/s/ Tom S. Lee</u>
UNITED STATES DISTRICT JUDGE